NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0293n.06

Filed: April 26, 2007

No. 06-5859

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ERIC L. LANCASTER,

    Plaintiff-Appellant,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant-Appellee.

    ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

_____/

BEFORE:     COLE, CLAY, and GILMAN, Circuit Judges.

    **CLAY, Circuit Judge.** Plaintiff Eric L. Lancaster appeals the district court's grant of summary judgment in favor of Defendant Commissioner of Social Security in this action brought under 42 U.S.C. § 405(g) to obtain judicial review of a decision from an administrative law judge ("ALJ") denying Plaintiff's application for disability insurance benefits. For the reasons that follow, we **REVERSE** the district court's decision and **REMAND** to the district court for further proceedings consistent with this opinion.

## BACKGROUND

### A. Plaintiff's Medical History

Plaintiff was born on October 23, 1965. He is a high school graduate and has worked as a delivery driver and machine operator. Plaintiff alleges that he has been unable to work due to "High Blood Pressure, Digenerative [sic] Disk Disease, [and] Severe Gauti [sic] Arthritis." (J.A. 91)[1] Plaintiff also has "symptoms of depression and anxiety." (J.A. 229) Plaintiff has had "3 spinal surgeries to repair ruptured disks," (J.A. 91), including "[a]nterior cervical diskectomy and interbody fusion" on September 16, 1996, (J.A. 151); "[l]umbar laminectomy infusion" on February 26, 2001, (J.A. 155); and "anterior cervical diskectomy and fusion with bone plate" on November 8, 2002, (J.A. 159).[2]

Plaintiff's treating physician, John J. Vaughan, M.D. ("Dr. Vaughan"),[3] has provided numerous opinions concerning Plaintiff's functional limitations and employability. On January 6, 2003, Dr. Vaughan noted that "[g]iven the fact he has a very stiff neck with multiple fusions and a lower back fusion, I am doubtful he will be able to return to any type of gainful employment." (J.A. 200) On June 1, 2004, Vaughan stated that "there is no way [Plaintiff] could go back and do any

---

[1] The parties did not submit a Joint Appendix; rather, the Court has "a full and accurate transcript of the entire record of proceedings relating to this case." (J.A. 1) For purposes of citing to the record, the Court will refer to the record as Joint Appendix.

[2] Plaintiff alleges that he has been unable to work since July 24, 2002, approximately three months prior to his last surgery.

[3] Throughout the record Dr. Vaughan's last name is incorrectly spelled "Vaughn."

type of gainful employment activity. He is limited by continued pain and lack of mobility in his spine." (J.A. 352) More specifically, Dr. Vaughan indicated that Plaintiff

> is [not] capable of lifting more than 5 pounds. He can do little to no bending or twisting of his neck or lower back. He is unable to sit for more than 5-7 minutes at a time, or greater than 1 hour per day. He is unable to stand or walk more than 5-7 minutes at a time, and no more than 1 hour per day. He frequently has to lie down to relieve his pain.

(J.A. 352)

On February 5, 2003, a physician associated with Defendant, Kenneth Phillips, M.D. ("Dr. Phillips"), found that Plaintiff could "[o]**ccasionally** lift and/or carry . . . 20 pounds," and "**frequently** lift and/or carry . . . 10 pounds." (J.A. 189) (emphasis in original). After a single medical evaluation, Dr. Phillips determined that Plaintiff could sit, "[s]tand and/or walk (with normal breaks) for a total of . . . about 6 hours in an 8-hour workday," *id.*, but that "[Plaintiff] had postural limitations such as no climbing of ropes or scaffolds and only occasional stooping." (Gov't Br. at 5; *see also* J.A. 190) Dr. Phillips found that he had limited overhead reach, and should "avoid even moderate exposure" to vibration. (J.A. 192) (capitalization omitted).

On June 3, 2003, Richard Sheridan, M.D. ("Dr. Sheridan") examined Plaintiff and found that Plaintiff could "work with [certain] permanent restrictions," including 1) "[n]o lift, push, pull or carry of anything greater than 10 lbs. to 15 lbs. frequently and 15 lbs. to 20 lbs. infrequently," 2) "[n]o climbing," 3) "[n]o rapid manual dexterity work with the right upper extremity," 4) "[n]o exposure to temperature extremes with the right upper extremity," and 5) "[n]o use of vibrating tools with the right upper extremity." (J.A. 253) After a single medical evaluation, Dr. Sheridan opined that "[Plaintiff] is at maximum medical improvement." *Id.*

Last, Plaintiff was examined by Timothy Kriss, M.D. ("Dr. Kriss"), a "neurosurgery and spine specialist," on February 17, 2004. (J.A. 285) Dr. Kriss found that

> [Plaintiff] did have previous anterior cervical diskectomy and fusion surgery . . . in 1995. He does have a "congenital" fusion . . . . However, I don't find convincing evidence that these conditions were ongoing and active at the time of the July 24th, 2002 work injury. The patient appeared to be quite capable of working in this same factory at this same moderately physically demanding job for approximately 18 months without any documented significant cervical symptoms, restrictions, or treatment prior to July 24th, 2002.

(J.A. 289) Unlike Dr. Sheridan, Dr. Kriss found that "[Plaintiff's] cervical condition may improve slightly or perhaps moderately over time with some additional treatment." *Id.* Dr. Kriss "recommend[ed] permanent restrictions of no lifting > 30 pounds, no frequent lifting > 15 pounds, the avoidance of frequent repetitive bending/twisting of the neck, no climbing, and minimization of overhead work." *Id.*

After conducting only one examination, Drs. Phillips, Sheridan, and Kriss found that Plaintiff was physically limited, but not as limited as indicated by Dr. Vaughan. Each physician reported different degrees of physical limitation. As Plaintiff's treating physician, Dr. Vaughan has had the opportunity to examine and treat Plaintiff since 1996. Over the course of his long-term medical treatment, Dr. Vaughan's diagnosis has been consistent. *Compare* J.A. 352 *with* J.A. 248 *and* J.A. 270.

**B.      Plaintiff's Vocational Evaluations**

Plaintiff had a "Vocational and Occupational Employability Evaluation" with Ralph M. Crystal, Ph.D. ("Dr. Crystal"), a vocational expert and consultant, on February 13, 2004. (J.A. 139) Dr. Crystal concluded that

[f]rom a vocational perspective at the current levels of physical and mental functioning there are unskilled, semi-skilled, and skilled jobs that are performed at the sedentary, light, and medium levels of exertion within the framework of the assessments indicated [by the different physicians who have examined Plaintiff]. [Plaintiff] would be able to perform a wide range of jobs in occupational areas such as clerical, factories, and related settings, which exist in the economy. Such jobs are typically performed at a bench, desk, table, or work station. [Plaintiff] is not disabled from employment even with the most restrictive combination of impairments.

(J.A. 147)

On May 13, 2004, and May 14, 2004, Plaintiff "participated in a Functional Capacity Evaluation." (J.A. 330) In the course of the evaluation,

[Plaintiff] demonstrated the ability to tolerate work activities below the criteria for Sedentary work level. The Sedentary work level is characterized by exerting up to 10 pounds rarely / occasionally, a negligible amount of force frequently, and no constant lifting.

*Id.* The evaluation concluded that Plaintiff "is unable to perform lifts, carries, pushing, pulling, crouching, balancing, repetitive squatting, kneeling, hand use, walking, or crawling without signficant [sic] changes in pain and sensation," (J.A. 334).

## C.    Plaintiff's Psychological Evaluations

Plaintiff also has had numerous psychological evaluations. Marc Plavin, Ph.D. ("Dr. Plavin"), a licensed psychologist, evaluated Plaintiff on May 3, 2003, and concluded that he had "[m]ajor depressive disorder, recurrent, moderate." (J.A. 229) On May 13, 2003, Laura Cutler, Ph.D. ("Dr. Cutler") found that, in the context of moderate, recurrent depression, "[Plaintiff] retains the capacity to: A) [u]nderstand and remember instructions; B) [s]ustain attnetion [sic] to complete tasks; C) [t]olerate co-workers, supervisors[ ] in a non-public setting [and] (D) [a]dapt to changes

in a routine work setting." *Id.* (formatting omitted). On September 26, 2003, a licensed clinical psychologist, Stuart A. Cooke, Ph.D. ("Dr. Cooke"), diagnosed Plaintiff with "Depressive Disorder" and "Panic Disorder," and noted "Psychosocial Stressors: Pain, loss of income, separat[ion] from wife for 8 years, single parent, [and] cousin's death." (J.A. 261) More recently, on March 4, 2004, Robert P. Granacher, Jr., M.D. ("Dr. Granacher"), a psychiatrist, diagnosed Plaintiff with "[m]ood disorder (major depression) due to spinal pathology." (J.A. 303) He found that "[Plaintiff] does not require psychiatric restrictions upon job performance . . . . [and] has the mental capacity to engage in any work he is trained, educated, or experienced to perform." *Id.*

**D.       Plaintiff's Applications for Disability Insurance Benefits**

Plaintiff filed an application for disability insurance benefits with the Social Security Administration ("SSA") on December 31, 2002, indicating that he "became unable to work because of [a] disabling condition on July 24, 2002." (J.A. 68) In processing Plaintiff's claim, the SSA reviewed medical records and evaluations. On February 12, 2003, the SSA denied Plaintiff's claim concluding that "[b]ased on a review of [Plaintiff's] medical problems [Plaintiff] do[es] not qualify for benefits . . . . because [Plaintiff] [is] not disabled under our rules." (J.A. 47) In pertinent part, the SSA found that

> [t]he medical evidence shows that [Plaintiff] ha[s] been treated for [his] conditions. [Plaintiff] report[s] degenerative disc disease, the medical evidence shows that there is no significant restriction in [[Plaintiff's] ability to stand and walk . . . . [Plaintiff] report[s] arthritis, the mediacl [sic] evidence shows that [Plaintiff] ha[s] adequate movement and strength in [his] joints. Although [Plaintiff's] blood pressure may become higher than normal at times, this condition has not caused any significant damage to [his] eyes, heart, liver or kidneys. [Plaintiff] report[s] acid reflux, the medical

6

records show that this condition does not severly [sic] affect [[Plaintiff's] general health . . . .
We have determined that [Plaintiff's] condition is not severe enough to keep [Plaintiff] from working.

(J.A. 47) Plaintiff appealed the SSA decision. On March 26, 2004, and August 2, 2004, an ALJ held a hearing on Plaintiff's application for disability benefits. (J.A. 360-69, 370-92) Plaintiff testified at the hearing and reported that he has back and neck problems and "significant weakness in [his] right hand. [Plaintiff] ha[s] a lot of pain that runs down [his] right arm and [his] right shoulder hurts, almost constantly." (J.A. 383)

The ALJ heard testimony from a vocational expert, Joyce Forrest ("Forrest" or "the vocational expert"), at the August 2, 2004 hearing. The ALJ asked Forrest:

> We'll assume a hypothetical individual, 37, the time [Plaintiff] filed his current claim. He has a twelfth-grade education. Assume, a first hypothetical individual could lift 20 pounds occasionally, 10 pounds more frequently, stand, walk 6/8, sit 6/8, no limits on the pushing with the arm. No climbing rope scaffolds and ladders or crawling, occasionally climb ramps and stairs, and stoop frequently, kneel and crouch.
>
> Occasionally, I had it written, occasional overhead reaching, no vibration, and has moderate limitations in ability to maintain attention and concentration for extended period and inability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform on a consistent pace without an unreasonable number and length of rest periods, *moderately limited ability* to interact appropriately with general public, can understand and remember instructions, sustain attention to complete a task, tolerate co-employees, supervisors in a non-public setting, can adapt to changes in routine work setting. Given that hypothetical, could this individual do any of [Plaintiff's] past relevant work?

(J.A. 365-66) (emphasis added). Forrest asked the ALJ to clarify whether the hypothetical question indicated "*mild restrictions on that last part?*" (J.A. 366) (emphasis added). Although the ALJ

7

originally indicated a "*moderately* limited ability" in the hypothetical question, he answered Forrest's question in the affirmative. (J.A. 366) Forrest testified that the hypothetical individual "could not do" Plaintiff's "past relevant work." *Id.*

The ALJ then asked Forrest:

> Now, assume the second hypothetical individual could lift 10 to 15 pounds frequently, 15 to 20 pounds infrequently, no climbing, no rapid manual, okay, no rapid, manual dexterity work with the right upper extremity, no temperature extremes, exposure to temperature extremes would be the right upper extremity, and no use of vibratory tools with the right upper extremity. Could that individual do a, *in addition to all the mental factors I gave you in the first hypothetical*, could that individual do a range of light work?

(J.A. 366) (emphasis added). Forrest testified that the second hypothetical individual could perform "work such as a ticket taker or attendant, desk clerk, recreations facility attendant." (J.A. 367) These positions were "just representative examples." *Id.* Forrest added that "[w]ithin that hypothetical, in Kentucky in the light category, there exists at least 11,000 such jobs, and within the U.S., at least 902,000 such jobs." *Id.*

The ALJ posed a "third hypothetical" to the vocational expert:

> [A]n individual would be prohibited from repetitive weights five pound, lifting repetitive weight, repetitive lifting of weights five pounds or more, no overhead lifting more than ten pounds, no bending or twisting, needs an alternate sit-stand. Could that individual do a range of sedentary work, with that, with those restrictions?

(J.A. 367) Forrest testified that this third hypothetical individual could perform sedentary work "[a]nd, in security there [are] jobs such as a gate attendant or surveillance system monitor . . . . [a]nd there exists in Kentucky . . . . at least 1,000 such jobs . . . . [a]nd within the U.S., there are at least

8

100,000 such jobs." (367-68) The ALJ inquired about other jobs "besides surveillance monitor." (J.A. 368) Forrest indicated that "[a]s a general office clerk, at least 50 percent of those jobs should fall within that category, and within Kentucky there, 50 percent of the sedentary general office work is 6,000 such jobs . . . . [a]nd within the U.S., at least 450,000 such jobs." (J.A. 368) Defendant's counsel also examined the vocational expert and asked her to assume that the hypothetical individual "must lie down . . . at least some of the time." (J.A. 369) Forrest indicated that lying down "would affect the job definitely." Indeed, "[i]t would eliminate the ability to perform, it would eliminate the jobs [ ] enumerated." (J.A. 369)

The ALJ denied Plaintiff's claim on January 13, 2005, finding that "[Plaintiff] is not disabled within the meaning of the Social Security Act." (J.A. 18) The ALJ found that Plaintiff's "allegations regarding his limitations are not totally credible." (J.A. 25) The ALJ stated that Plaintiff's "*mental impairments causes mild restrictions of his activities of daily living and moderate difficulties in maintaining social functioning*," including "*moderate deficiencies* in concentration, persistence, or pace." (J.A. 20) (emphasis added). Nevertheless, the ALJ found that Plaintiff is

> able to walk around the park; throw the football with his son; watch movies at home with his son; drive; help his son to school; fix food; shop for groceries; handle money responsibilities; watch television; visit with friends/relatives; do some household chores; read the newspaper; use the telephone; attend movies; and attend to his personal needs.

(J.A. 20) The ALJ concluded that Plaintiff

> retains the following residual functional capacity: no lifting, pushing, pulling or carrying of anything greater than 10 to 15 pounds frequently and 15 to 20 pounds infrequently; no climbing; no rapid manual dexterity work with the right upper extremity; no exposure to temperature extremes with the right upper extremity; no use of

9

> vibrating tools with the right upper extremity; [he] can understand and remember instructions, sustain attention to complete tasks, tolerate co-workers and supervisors in a non-public setting, and adapt to changes in a routine work setting; his abilities to maintain attention and concentration for extended period, to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and to interact appropriately with the general public, *are moderately limited.*

(J.A. 22) (emphasis added). According to the ALJ, Plaintiff "has the residual functional capacity to perform a significant range of light work." (J.A. 26) "Examples of such jobs include work as a ticket taker, desk clerk and recreation aide -- there are 11,000 such jobs in the state and 902,000 in the nation." (J.A. 26) The ALJ indicated that the

> conclusion that [Plaintiff] is not disabled is further supported by the opinions of the State agency medical consultants. As those of nonexamining physicians, their opinions are not entitled to controlling weight, but must be considered and weighed as those of highly qualified physicians and psychologists who also are experts in the evaluation of the medical issues in disability claims.

(J.A. 22) The ALJ noted "Dr. Vaughn's [sic] opinion that [Plaintiff] is disabled," but held that

> his opinion . . . is an opinion on an issue that is reserved to the Commissioner and, thus, is never entitled to controlling weight or special significance . . . . In this case, the [ALJ] finds that Dr. Vaughn's [sic] opinion of disability and his specific assessments of [Plaintiff's] residual functional capacity are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with the other substantial evidence in the record, including the broad range of activities of daily living in which is able to engage.

(J.A. 22-23)

The Appeals Council affirmed the ALJ's decision. On August 8, 2005, Plaintiff commenced this action challenging the Appeals Council's decision. The case was referred to a Magistrate Judge.

On April 10, 2006, the Magistrate Judge recommended that the district court grant summary judgment in favor of Defendant and affirm the denial of Plaintiff's application for disability insurance benefits. In the recommendation, the Magistrate Judge noted that "[i]n his decision, the ALJ summarized all of the medical evidence of record" and "explains why he declined to adopt Dr. Vaughn's [sic] opinion that plaintiff was totally disabled." (Plaintiff's Br. at App'x) Plaintiff filed objections to the Magistrate Judge's recommendation. The district court "reviewed the record *de novo* in light of those objections," and "adopt[ed] the magistrate judge's report and recommendation." *Id.* The district court granted Defendant's motion for summary judgment on April 28, 2006. On June 22, 2006, Plaintiff filed a timely notice of appeal.

On appeal, Plaintiff argues that the hypothetical questions the ALJ submitted to the vocational expert in the August 2, 2004 hearing did not accurately describe Plaintiff's abilities and limitations. He contends that a conflict exists between Forrest's testimony and the Dictionary of Occupational Titles ("DOT"). Last, Plaintiff maintains that the ALJ did not properly weigh the medical opinion evidence in determining Plaintiff's residual functional capacity. For its part, Defendant argues that the ALJ's decision is supported by substantial evidence in the record.

## DISCUSSION

I. **WHETHER THE HYPOTHETICAL QUESTION SUBMITTED TO THE VOCATIONAL EXPERT ACCURATELY DESCRIBED PLAINTIFF'S ABILITIES AND LIMITATIONS**

### *Standard of Review*

When reviewing a finding that Plaintiff is not disabled under the Social Security Act, this Court considers whether the decision is supported by substantial evidence and whether the ALJ

employed the proper legal standards. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Willbanks v. Sec'y of Health and Human Servs.*, 847 F.2d 301, 303 (6th Cir.1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 237-38 (6th Cir. 2002); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). In this case, the same standard of review applies to all the claims pending before the Court.

***Analysis***

To be considered disabled under the Social Security Act, a person must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). Under 42 U.S.C. § 1382c(a)(3)(B),

> an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). "Plaintiff has the ultimate burden of establishing the existence of a disability." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the

Secretary to make a disability determination, rests with the claimant."). This Court employs a five-prong test to evaluate disability claims:

> The claimant must first show that she is not engaged in substantial gainful activity. Next, the claimant must demonstrate that she has a "severe impairment." A finding of "disabled" will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and "meets or equals a listed impairment." If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work.

*Foster*, 279 F.3d at 354 (citations omitted); *see also* 20 C.F.R. § 404.1520.

In the instant case, the ALJ expressly found that Plaintiff "is unable to perform any of his past relevant work." (J.A. 26) In light of this finding, "[t]he burden shifts to [Defendant] . . . to establish [Plaintiff's] ability to do other work." *Foster*, 279 F.3d at 354; *see also Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990) ("The Secretary determined that [plaintiff] could not return to his past relevant work, and that determination shifted the burden to the Secretary to show by substantial evidence that [plaintiff] could perform work that exists in the national economy."). The ALJ elicited vocational expert testimony at the August 2, 2004 hearing to show that there is "a significant number of jobs in the national economy that [Plaintiff] could perform." (Def. Br. at 16) When the ALJ examined Forrest, he indicated that the hypothetical individual has

> *moderately limited ability* to interact appropriately with general public, can understand and remember instructions, sustain attention to complete a task, tolerate co-employees, supervisors in a non-public

13

setting, can adapt to changes in routine work setting. Given that hypothetical, could this individual do any of [Plaintiff's] past relevant work?

(J.A. 365-66) (emphasis added). After the ALJ recited the hypothetical, Forrest asked the ALJ to clarify whether the hypothetical question indicated "*mild restrictions on that last part? Was it mild, I wanted to make sure.*" (J.A. 366) (emphasis added). Although the ALJ had originally included "*moderately* limited ability" in the hypothetical question, he expressly indicated to Forrest that the hypothetical individual has "mild restrictions." (J.A. 366) After the degree of restriction was clarified, Forrest answered the hypothetical question. In the denial decision, the ALJ specifically found that Plaintiff's

> abilities to maintain attention and concentration for extended period, to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and to interact appropriately with the general public, *are moderately limited.*

(J.A. 22) (emphasis added). The hypothetical restriction in the ALJ's question to the vocational expert is not the same restriction which the ALJ ultimately found with respect to Plaintiff. *Compare* J.A. 22 *with* J.A. 366. The ALJ concluded that Plaintiff "has the residual functional capacity to perform a significant range of light work," and as "[e]xamples of such jobs" the ALJ listed "work as a ticket taker, desk clerk and recreation aide." (J.A. 26) The jobs the ALJ mentioned are the same jobs that Forrest discussed when the ALJ instructed her to assume an individual with "mild restrictions." (J.A. 366) When Forrest testified about these jobs, Forrest "specifically assumed that the limitations in [ ] work-related areas were only 'mild.'" (Plaintiff's Br. at 9) The ALJ erred in

14

relying on these jobs because they were discussed exclusively in the context of mild restrictions, and not the moderate restrictions which the ALJ ultimately found in Plaintiff.

There is a substantial and meaningful distinction between mild and moderate restrictions. "If one has only 'mild' limitations . . . the person can work, but 'moderate' limitations . . . would keep a person from performing [ticket taker, desk clerk and recreation aide work] for 8 hours." (Plaintiff's Br. at 10). The "functional capacity assessment" in the record appears to confirm that the restrictions in the ALJ's hypothetical should have been moderate because it discusses Plaintiff's limitations in the context of *moderate*, recurrent depression. (J.A. 233) (capitalization omitted). Similarly, other mental health evaluations in the record, such as Dr. Plavin's examination results, (J.A. 229), and a "medical assessment of ability to do work-related activities" suggest that the Plaintiff's limitations are moderate and not mild. (J.A. 357) (capitalization omitted).

This Court has found that "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, *but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments.'*" *Varley*, 820 F.2d at 779 (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)) (alteration in original) (emphasis added). "While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny*, 745 F.2d at 218; *see also Tennant v. Schweiker*, 682 F.2d 707, 711 (8th Cir.1982) ("This Court has repeatedly warned that hypothetical

questions posed to vocational experts . . . should precisely set out the claimant's particular physical and mental impairments.").

In this case, "we cannot assume that the vocational expert would have answered in a similar manner had the ALJ instructed [her]" properly. *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) (concluding that Defendant "failed to meet its burden of showing that the appellant could perform other gainful employment in the economy" with substantial evidence.). The factual assumptions underlying the ALJ's hypothetical question required the vocational expert to assume that Plaintiff's restrictions were mild. "The hypothetical question [ ] fails to describe accurately [Plaintiff's] physical and mental impairments; a defect which . . . is fatal to the [vocational expert's] testimony and the ALJ's reliance upon it." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). If the hypothetical question does not accurately portray Plaintiff's physical and mental state, the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work. The ALJ failed to ensure that the hypothetical questions posed to the vocational expert adequately and accurately describe Defendant's limitations.

## II. WHETHER A CONFLICT EXISTS BETWEEN THE TESTIMONY OF THE VOCATIONAL EXPERT AND THE DOT

### *Analysis*

"A Social Security Ruling ["SSR"] sets forth the actions required of an ALJ when there is an apparent conflict between the testimony of the vocational expert and the DOT." *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (unpublished case). In pertinent part, the applicable SSR provides that

> [o]ccupational evidence provided by a [vocational expert] or [vocational specialist] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] or [vocational specialist] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] or [vocational specialist] evidence to support a determination or decision about whether the claimant is disabled.

SSR 00-4p, 2000 WL 1898704, at *2 (SSA Dec. 4, 2000). SSR holdings "are binding on all components of the Social Security Administration. These rulings represent precedent final opinions and orders and statements of policy and interpretations that we have adopted." 20 C.F.R. § 402.35(b)(1).

Courts are divided as to whether the failure to inquire into DOT inconsistencies entitles a Plaintiff to relief. In *Steward v. Barnhart*, the Ninth Circuit found that a plaintiff was entitled to relief because all three jobs the expert testified that plaintiff could perform were in conflict with the DOT. 44 F. App'x 151, 152 (9th Cir. 2002) (unpublished case). In *Teverbaugh v. Comm'r of Soc. Sec.*, 258 F. Supp. 2d 702 (E.D. Mich. 2003), a case where "[i]t [was] undisputed that the ALJ failed to question the [vocational expert] regarding whether the jobs she identified as being consistent with Plaintiff's residual functional capacity [ ] conflicted with the DOT," *id.* at 705, the court found that ALJ "failed to ensure there was no conflict" and held that the "ALJ's failure to carry its burden at this step is reversible error," *id.* at 706. Other courts have found that

> claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. Adopting a middle ground approach, in which neither the

DOT nor the vocational expert testimony is per se controlling, permits a more straightforward approach.

*Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000); *see also Boone v. Barnhart*, 353 F.3d 203, 206 (3d Cir. 2003) ("While we do not adopt a general rule that an unexplained conflict between a [vocational expert's] testimony and the DOT necessarily requires reversal, we do conclude that the [vocational expert's] testimony in this case is not substantial evidence."); *Justin v. Massanari*, 20 F. App'x 158, 160 (4th Cir. 2001) (unpublished case) (finding that an ALJ is only required "to address evident discrepancies between a vocational expert's testimony and the [DOT]"); *Brown v. Barnhart*, 408 F. Supp. 2d 28, 35 (D.D.C. 2006) ("Even if SSR 00-4p places an affirmative duty on the judge, such a procedural requirement would not necessarily bestow upon a plaintiff the right of automatic remand where that duty was unmet.").

In this case, "[a] review of the colloquy between the ALJ and the [vocational expert] reflects that the ALJ did not ask the [vocational expert] if the jobs she identified that plaintiff could perform were consistently classified in the DOT." (Plaintiff's Br. at App'x). Nevertheless, the ALJ found that "[t]he vocational expert's responses to questions regarding vocational issues are found to be consistent with information contained in the [DOT]." (J.A. 25 n.2) The magistrate judge found that since "there was no conflict for the ALJ to resolve between the [vocational expert's] testimony and the DOT," the failure to ask Forrest about DOT classifications constitutes a "harmless error." (Plaintiff's Br. at App'x) The district court adopted the magistrate judge's findings.

Plaintiff contends that the failure to examine the vocational expert is not harmless because there are inconsistencies between the testimony and the DOT. Plaintiff maintains that "all the jobs the vocational expert listed are eliminated by being semi-skilled or by requiring significant public

18

contact." (Plaintiff's Br. at 16) For its part, Defendant argues that the ALJ did not limit Plaintiff to unskilled jobs or to positions with limited public contact. Defendant's argument is without merit.

The ALJ specifically found that Plaintiff "has no transferable skills from any past relevant work." (J.A. 24) A desk clerk job has a "specific vocational preparation" ("SVP") level of three. (Def. Br. at App'x) (capitalization omitted). "[S]emi-skilled work corresponds to an SVP of 3-4." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). "[Residual functional capacity] alone never establishes the capability for skilled or semiskilled work. Ability to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work." SSR 83-10, 1983 WL 31251, at *3 (1983). "Under [SSA] rulings and regulations, [Plaintiff] must possess transferable skills from previous work in order to perform SVP-3 jobs," such as a desk clerk position. *Steward*, 44 F. App'x at 152. "[Plaintiff] was not capable of performing the [desk clerk] job[ ] as a matter of SSA regulations, even if persuasive evidence supported the [vocational expert's] deviation from the skill levels in the [DOT]." *Id.* Therefore, of the three occupations which Forrest mentioned in her testimony, an inconsistency with the DOT clearly exists with respect to at least one job, the desk clerk position.

Whether or not inconsistencies exist is not dispositive in this case because the vocational expert's testimony was unreliable. Forrest identified all positions under the impression that the ALJ's hypothetical questions involved an individual with "mild restrictions." (J.A. 366) The positions identified by Forrest, and adopted by the ALJ, fail to meet Plaintiff's physical restrictions and mental health limitations. The positions are simply not reliable because they are for "mild"

restrictions, and not "moderate" limitations as the ALJ ultimately found, regardless of their consistency or conflict with the DOT. *See, e.g.*, *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (finding that if the hypothetical question does not accurately portray Plaintiff's physical and mental state, the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that plaintiff could perform other work); *Steward*, 44 F. App'x at 152; *Teverbaugh*, 258 F. Supp. 2d at 705-06. The ALJ failed to ensure that all jobs enumerated by the vocational expert were consistent with the DOT.

## III. WHETHER THE ADMINISTRATIVE LAW JUDGE PROPERLY WEIGHED THE MEDICAL OPINION EVIDENCE

### *Analysis*

Plaintiff contends that the ALJ did not give appropriate weight to the opinions of his treating orthopedic surgeon, Dr. Vaughan, who avers that Plaintiff is disabled. Plaintiff argues that the ALJ erred "when he gave the most weight to Dr. Sheridan who did only a one-time exam . . . for his 'recognized conditions' related to his workers' compensation claim." (Plaintiff's Br. at 17)

According to SSA regulations,

> *we give more weight to opinions from your treating sources*, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2) (emphasis added); *see also Walker v. Sec'y of Health and Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) ("The treating physician has had a greater opportunity to examine and observe the patient. Further, as a result of his duty to cure the patient, the treating

physician is generally more familiar with the patient's condition than are other physicians."); *Schisler v. Heckler*, 787 F.2d 76, 85 (2d Cir.1986) (explaining that "a treating physician's opinion on the subject of medical disability is binding on the factfinder unless contradicted by substantial evidence."). The SSA has indicated that

> [a]lthough opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, *opinions from sources other than treating sources can never be entitled to "controlling weight."*

SSR 96-2p, 1996 WL 374188, at *2 (SSA July 2, 1996) (emphasis added). "The medical opinion of the treating physician is to be given substantial deference-and, if that opinion is not contradicted, complete deference must be given." *Walker*, 980 F.2d at 1070. "When [the ALJ] do[es] not give the treating source's opinion controlling weight, [the ALJ] appl[ies] [various] factors . . in determining the weight to give the opinion," including the length, frequency, nature and extent of the treatment relationship; evidence in support of the opinion; consistency of the opinion with evidence in the record; physician's specialization; and other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(d). The ALJ "will always give good reasons in [the] notice of determination or decision for the weight . . . give[n] [to] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). "[T]he ultimate decision of disability rests with the [ALJ]." *Walker*, 980 F.2d at 1070. The ALJ "is not bound by treating physicians' opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994).

In the instant case, the ALJ expressly stated:

> The undersigned will note here that he has considered Dr. Vaughn's [sic] opinion that the claimant is disabled. Even though Dr. Vaughn [sic] is a treating source, his opinion that the claimant is "disabled" is an opinion on an issue that is reserved to the Commissioner and, thus, is never entitled to controlling weight or special significance. Nevertheless, the [ALJ] may not ignore such an opinion . . . . In this case, the undersigned finds that Dr. Vaughn's [sic] opinion of disability and his specific assessments of the claimant's residual functional capacity are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with the other substantial evidence in the record, including the broad range of activities of daily living in which is able to engage. Therefore, the undersigned concludes that Dr. Vaughn's [sic] opinion of disability cannot be adopted.

(J.A. 22-23) The ALJ's decision appears to set forth an incorrect legal standard with respect to the weight afforded to a treating physician's opinion. Admittedly, when the ALJ indicated that Dr. Vaughan's opinion "is never entitled to controlling weight or special significance," he *may* have been addressing Dr. Vaughan's opinion concerning the merits of Plaintiff's disability claims and not Dr. Vaughan's medical assessment. (J.A. 22-23) However, a clear distinction between Dr. Vaughan's medical and non-medical statements is not set forth in the ALJ's decision. This is an important distinction because "regulations differentiate between physician opinions concerning what a claimant can still do and the claimant's physical and mental restrictions, which the Commissioner will consider, and a physician's statements such as 'a claimant is disabled' or 'unable to work,' which are not medical opinions, but opinions on issues reserved to the Commissioner." (Def. Br. at 26 n.6) (citing 20 C.F.R. §§ 404.1527(a), (b), and (e)). Since the decision is ambiguous in that regard, the ALJ failed to properly set forth the legal standard with respect to the weight afforded to a treating physician's opinion.

Even if the ALJ used the correct legal standard, the ALJ's decision to discount Dr. Vaughan's opinion is not supported by substantial evidence in the record. In this case, the ALJ held that "Dr. Sheridan's assessment best comports with the totality of the evidence." (J.A. 23) However, the record indicates that Dr. Sheridan "did only a one-time exam for [Plaintiff]" in connection with a "workers' compensation claim." (Plaintiff's Br. at 17) Dr. Sheridan's assessment was based on a limited and discrete workers' compensation evaluation which was simply not exhaustive or accurate. For example, the record indicates that Dr. Sheridan diagnosed Plaintiff with maximum medical improvement in 2003, but later medical assessments indicate otherwise. Dr. Vaughan has treated and performed three surgeries on Plaintiff since 1996. In the course of his treatment and examination, he has found that Plaintiff

> is [not] capable of lifting more than 5 pounds. He can do little to no bending or twisting of his neck or lower back. He is unable to sit for more than 5-7 minutes at a time, or greater than 1 hour per day. He is unable to stand or walk more than 5-7 minutes at a time, and no more than 1 hour per day. He frequently has to lie down to relieve his pain.

(J.A. 352) The ALJ did not provide any explanation for why he found that Dr. Vaughan's medical opinions were not supported by clinical and laboratory diagnostic techniques. The ALJ failed to point to specific evidence in the record which undermines Dr. Vaughan's medical opinions. The ALJ failed to identify "substantial medical evidence to the contrary." *Cutlip*, 25 F.3d at 287. In this case, the ALJ inconsistently characterized Plaintiff's restrictions as "mild" or "moderate," misconstrued the vocational expert's testimony, and did not ensure that the vocational expert's testimony was consistent with the DOT. Although these are separate issues, these occurrences raise serious questions about the ALJ's assessment of the medical evidence. Therefore, we find that the

ALJ's decision to discount Dr. Vaughan's opinion is not supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** to the district court with instructions to remand to the ALJ for further proceedings consistent with this opinion.

**RONALD LEE GILMAN, Circuit Judge, concurring.** I concur in the judgment, but write separately to highlight what I see as the primary reason to reverse the decision of the district court. The key issue in this case is the ALJ's misstatement in clarifying his hypothetical questions to the vocational expert. But for the ALJ's error in telling the vocational expert that Lancaster's mental impairments were "mild," when in fact the hypothetical questions characterized them as "moderate," I would be inclined to affirm the judgment of the district court. The ALJ's opinion was otherwise thorough and supported by substantial evidence. Because Lancaster's mental limitations are so important to the determination of his ability to work, however, I am persuaded by the lead opinion that a remand for further proceedings is appropriate.